## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| State Bank of Bellingham, | Case No. 13-cv-0900 (SRN/JJG) |
| Plaintiff and Counterclaim Defendant, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| BancInsure, Inc., | |
| Defendant and Counterclaim Plaintiff. | |

Jonathan M. Bye and Bryan R. Freeman, Lindquist & Vennum, PLLP, 4200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for Plaintiff.

Joseph A. Nilan, Mark J. Johnson, T. James Power, and Joshua A. Dorothy, Gregerson, Rosow, Johnson & Nilan, Ltd., 650 Third Avenue South, Suite 1600, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.   INTRODUCTION

This matter is before the Court on Plaintiff State Bank of Bellingham's Motion for Partial Summary Judgment, for Attorney's Fees and for Punitive Damages [Doc. No. 15], as well as the parties' cross-motions for summary judgment [Doc. Nos. 76, 88]. For the reasons stated below, the Court grants in part and denies in part Plaintiff's Motion for Partial Summary Judgment [Doc. No. 15], grants Plaintiff's Motion for Summary Judgment [Doc. No. 76], and denies Defendant BancInsure Inc.'s Motion for Summary Judgment [Doc. No. 88].

## II.     BACKGROUND

### A.     The Parties and the Bond

Plaintiff is a "Minnesota state bank with five employees and one location in Bellingham, Minnesota." (Carman Decl. [Doc. No. 80], ¶ 2.) Defendant is an insurance company that is incorporated in Oklahoma. (Compl. [Doc. No. 1], ¶ 5; Amended Answer and Counterclaim [Doc. No. 36], ¶ 5.) In October 2010, Defendant issued Financial Institution Bond No. FIB0011607 (the "Bond") to Bellingham Corporation, with coverage effective from October 17, 2010, to October 17, 2013. (Bye Decl. dated April 25, 2014 [Doc. No. 79] ("Second Bye Decl."), Ex. A (BancInsure Financial Institution Bond), at 166[1].) Plaintiff is a named insured on the Bond. (Id. at 168.) Under the Bond, Defendant agrees to indemnify Plaintiff in various circumstances, collectively referred to as "Insuring Agreements," including—relevant to this case—in the case of "computer systems fraud." (Id. at 166.) Under that provision, referred to as "Insuring Agreement (H)":

Loss resulting directly from a fraudulent

(1)     entry of Electronic Data or Computer Program into, or

(2)     change of Electronic Data or Computer Program within

any Computer System operated by the Insured, whether owned or leased, or any Computer System identified in the application for this Bond, or a Computer System first used by the Insured during the Bond Period, provided the entry or change causes

(1)     property to be transferred, paid or delivered,

---

[1]     Many of the exhibits in this case consist of documents with Bates-labels beginning with "BI_000." The Court will omit all but the final numerical digits from its citations to these page numbers.

(2)     an account of the Insured or of its customer to be added, deleted, debited or credited, or

(3)     an unauthorized account or a fictitious account to be debited or credited.

In this Insuring Agreement (H), fraudulent entry or change shall include such entry or change made by an employee of the Insured acting in good faith

(1)     on an instruction from a software contractor who has a written agreement with the Insured to design, implement or service programs for a Computer System covered by this Insuring Agreement (H), or

(2)     on an instruction transmitted by Tested telex or similar means of Tested communication identified in the application for this Bond purportedly sent by a customer, financial institution, or automated clearing house.

(Id. at 173.)  Coverage under Insuring Agreement (H) provides a single loss limit of liability

of $500,000, with a $5,000 deductible.  (Id. at 166.)

The Bond also includes numerous exclusions.  Relevant to the present motions,

Section 2 of the Bond states that it "does not cover":

. . . .

(h)     loss caused by an Employee, except when covered under Insuring Agreement (A) or when covered under Insuring Agreement (B), (C) or (R) and resulting directly from misplacement, mysterious unexplainable disappearance or destruction of or damage to Property;

. . . .

(bb)    under Insuring Agreements (H), (I), (J), (K), (L), (M), (N) and (O), in addition to all of the other Exclusions

. . . .

(4)     loss resulting directly or indirectly from theft of confidential information,

3

. . . .

(12)    loss resulting directly or indirectly from

(a)    mechanical failure, faulty construction, error in design, latent defect, fire, wear or tear, gradual deterioration, electrical disturbance or electrical surge which affects a Computer System,

(b)    failure or breakdown of electronic data processing media, or

(c)    error or omission in programming or processing,

. . . .

(17)    loss caused by a director or Employee of the Insured or by a person in collusion with any director or Employee of the Insured . . . except when loss is caused by an Employee and covered under Insuring Agreement (L) or (M) . . . .

(Id. at 186, 188.)  Section 5 of the Bond requires the following in the event of a loss:

(a)    At the earliest practicable moment, not to exceed sixty (60) days, after discovery of loss, the Insured shall give the Company notice of the loss.

(b)    Within 6 months after such discovery, the Insured shall furnish to the Company proof of loss, duly sworn to, with full particulars.

. . . .

(Id. at 190.)  Finally, Section 7 states:

. . . .

(d)    Upon the Company's request and at reasonable times and places designated by the Company the Insured shall

(1)    submit to examination by the Company and subscribe to the same under oath,

4

(2)     produce for the Company's examination all pertinent records, and

(3)     cooperate with the Company in all matters pertaining to the loss.

(e)     The Insured shall execute all papers and render assistance to secure to the Company the rights and causes of action provided for in this Section 7. The Insured shall do nothing after discovery of loss to prejudice such rights or causes of action.

(Id. at 191.)

## B.      Wire Transfers at the Bank

The loss at issue stems from a fraudulent wire transfer. At the time the loss occurred, Plaintiff made its wire transfers through the Federal Reserve's FedLine Advantage Plus system ("FedLine"). (Carman Decl. ¶ 4.) Plaintiff used a desktop computer that was connected to a Virtual Private Network device ("VPN") provided by the Federal Reserve. (Id.) The VPN was both a modem and an encryptor. (Id.) It encrypted the information entered on the computer and transmitted it over the internet to the Federal Reserve, where the information was then decrypted. (Id.) In order to complete a wire transfer on FedLine, a user had to enter an authorized user name and three passwords. (Id. ¶ 5.) One of the passwords was provided by a security token issued by FedLine that had to be inserted into a USB port on the computer. (Id.) The other two passwords were typed in by the user. (Id.) And, although it was not required by FedLine, wire instructions had to be verified by entry of a second user name and set of passwords. (Id.)

### C.    The Day Before the Loss

On October 27, 2011, one of Plaintiff's employees, Sharon Kirchberg, accessed

FedLine in order to complete a wire transfer.  (Nilan Aff. [Doc. No. 90], Ex. 4 (Kirchberg

Dep. 49:2–6).)  Ms. Kirchberg's token, password, and pass phrase, as well as the token,

password, and pass phrase of another employee, were used to complete the transfer.  (See

id., Ex. 4 (Kirchberg Dep. 49:13–53:15).)  When Ms. Kirchberg left the Bank for the day,

she left both tokens in the computer and left the computer running.  (Id., Ex. 4 (Kirchberg

Dep. 53:18–54:13).)

### D.    The Loss

On October 28, Ms. Kirchberg arrived at work and accessed Fedline's Account

Information Management application, which shows Plaintiff's account balance with the

Federal Reserve.  (Second Bye Decl., Ex. H (Proof of Loss), at 444.)  At approximately 8:12

a.m. CST, she noticed that $940,000 had been transferred out of the bank using Fedwire

Funds, which is part of FedLine.  (Id.)  She began investigating the entry and discovered

that someone had attempted to initiate two wire transfers from a Demand Deposit Account

at the bank to two different banks in Poland.  (Id. at 444–45.)  The first transfer, to a

Citibank account in Warsaw, was in the amount of $485,000 and was initiated at 7:12 a.m.

CST (Id. at 444.)  That transfer was completed at 7:25 a.m. CST using the user name and

passwords of Ms. Kirchberg and one other employee.  (Id. at 444–45.)  However, neither of

those employees authorized or verified the transfer or had access to FedLine at the time of

the transfer.  (Id. at 445.)  The second transfer, to an ING Bank account in Katowice, was in

the amount of $455,000 and was initiated at 7:21 a.m. CST and completed at 7:25 a.m.

CST.  (Id.)  The same user names and passwords were used, but, again, neither employee even had access to FedLine at the time of the transfer.  (Id.)  Both transferee accounts were in the name of Markus Vorreas.  (Id.)

Ms. Kirchberg immediately attempted to reverse the wire transfers using FedLine. (Id.)  However, shortly after 8:00 a.m., Plaintiff's internet service provider experienced a distributed denial-of-service attack ("DDoS"), which disabled internet service near Plaintiff. (Id.)  Accordingly, Ms. Kirchberg was unable to electronically request reversal of the transfers.  (Id.)  She then called the Federal Reserve and requested the reversals, but her request was denied.  (Id.)

On October 31, the Federal Reserve notified the two intermediary institutions for the transfers that the transfers were fraudulent.  (Id. at 446.)  While the intermediary institution for the second transfer was able to revert the transferred funds to Plaintiff, the $485,000 that was transferred to the Citibank account in Warsaw has never been credited or reverted.  (Id.)

### E.     The Investigation

Plaintiff notified Defendant of the loss on October 28—the day it occurred—by faxing a copy of the transaction details of the two transfers.  (See Nilan Aff., Ex. 21 (Fax Transmittal).)  On November 3, BancInsure acknowledged receipt of Plaintiff's notice and advised Plaintiff that the claim had been assigned to Karbal Cohen Economou Silk Dunne ("KCESD") for investigation.  (Dorothy Aff. [Doc. No. 22], Ex. 5 (Letter), at 272.)  In a letter dated November 9, KCESD reminded Plaintiff of its obligation under Section 5(b) of the Bond to provide Defendant with "'proof of loss, duly sworn to, with full particulars,'" within six months of discovering the loss.  (Nilan Aff., Ex. 22, at 381.)  The letter included a

7

Proof of Loss form and requested that the proof of loss include documentation of the loss, "full details concerning the transactions involved," "as detailed a narrative as possible regarding the circumstances surrounding the Bank's discovery of [the] loss," contact information for any law enforcement authorities investigating the matter, pleadings in any legal proceedings that were initiated, and any other relevant documents.  (Id. at 382.)  The letter also requested that the proof of loss "detail the Bank's security procedures" and that Plaintiff provide copies of the transaction records involving the transfers at issue.  (Id.) Defendant reserved the right to make further inquiries and requests.  (Id.)

Defendant received Plaintiff's Proof of Loss, in which Plaintiff claimed a net loss of $485,100, on December 27, 2011.  (Second Bye Decl., Ex. H (Proof of Loss), at 442–43.) In the "Details of Loss" section of the form, Plaintiff stated that "an unknown individual or individuals gained unauthorized access to the FedLine Advantage Plus service on the State Bank of Bellingham's computer systems and fraudulently authorized two wire transfers." (Id. at 444.)  Plaintiff went on to describe Ms. Kirchberg's discovery and attempted reversal of the transfers.  (See id. at 444–45.)  Plaintiff stated that, in addition to the Federal Reserve, it had notified various law enforcement agencies and that the FBI had examined Plaintiff's computers but Plaintiff was not aware of the status of any investigations.  (Id. at 446.)  As for its security measures, Plaintiff provided as follows:

> . . . Internally, the Bank follows standard security procedures with respect to user names and passwords for its systems in accordance with the Federal Reserve Banks' Password Practice Statement.  All systems on the internal network have Symantec Small Business Endpoint Protection 12.5, with not only antivirus and antispyware features but a desktop firewall and intrusion detection/protection.  This security suite is centrally managed by the network server for definitions and threat management and updates automatically.

> Additionally, the native Windows firewall is activated on computers on the internal network and the computers are configured to limit the software that can be installed on the device.
>
> As for external threats, the Bank uses a Sonic WALL NSA 240 firewall. The firewall has Gateway Antivirus and Gateway Anti-Spyware inspecting all traffic before passing through the gateway and uses Gateway Intrusion Protection. This security suite likewise is updated automatically on a daily basis, meaning no user accesses or modifies the firewall or the settings of the software overall.
>
> The Bank also has surveillance cameras on premises. The recordings of October 27 and October 28 show no one entered the Bank between the time it closed on October 27 and the time employees returned on the morning of October 28.

(Id. at 446–47.) Plaintiff attached a print-out of its account balance activity with the Federal Reserve banks as of 8:12 a.m. CST on October 28, 2011; the transaction details for each of the two wire transfers; a letter from Plaintiff's internet service provider explaining the service outage on October 28, 2011; communications from the intermediary institutions involved in the transfers; and contact information for the law enforcement authorities that Plaintiff had contacted. (See id. at 448–59.)

In early February 2012, KCESD requested that Plaintiff and its counsel participate in a conference call or face-to-face meeting to discuss the loss, but Plaintiff's counsel asked that any questions instead be presented in writing. (Nilan Aff., Ex. 23 (Letter), at 527.) Accordingly, on February 6, KCESD provided Plaintiff's counsel with a list of questions and document requests regarding Plaintiff's security procedures, Fedline, proof of coverage, Plaintiff's computer system, and Plaintiff's investigation of the loss. (See id. at 528–32.) Plaintiff's counsel responded on February 29, providing answers to the questions, a letter

from the FBI to Ms. Kirchberg, and surveillance videos.  (Id., Ex. 25 (Letter).)  In response

to the questions regarding proof of loss, Plaintiff stated as follows:

> SBB does not know the exact method by which the cyber thieves initiated the
> transfers but believe[s] that since access could be achieved only through a
> bank computer and Federal Reserve-provided hardware and software, hackers
> may have somehow installed a computer program, e.g., a Trojan, worm or
> other malware, that did keystroke logging or otherwise modified, deleted or
> stole data in order to gain information necessary for the transfers or such other
> steps to enable them to obtain that information and initiate the transfers.
>
> . . . .
>
> SBB does not know the exact method by which the cyber thieves initiated the
> transfers but the customer account attempted to be used for the transfers had
> reoccurring wire transfers with a particular bank.   To accomplish the
> transfers, the thieves would have to fraudulently enter or change data or
> information on SBB's computers regarding that client, including such items
> as the intermediary bank, the receiving bank and account numbers.

(Id. at 591–92.)  Plaintiff indicated that it had not done a forensic analysis of its computer

system, but that the FBI had.  (Id.)  In addition, Plaintiff noted that in the ninety days

preceding the fraudulent transfers, there may have been some automatic updates in the

hardware and software but that Plaintiff had not initiated any updates.  (Id. at 593.)

On May 9, 2012, Defendant issued its preliminary coverage evaluation of Plaintiff's

claim.  (Id., Ex. 26 (Letter).)  Defendant noted that Plaintiff had not conducted a forensic

investigation of the loss and that the government would not provide the results of its

investigation to Defendant.  (Id. at 792.)  Accordingly, Defendant concluded that there was

"insufficient evidence" in the record before it to determine whether the loss was covered by

the Bond and that it was necessary to hire a forensic computer specialist to conduct an

investigation.  (Id. at 787.)

On May 15, Defendant's counsel informed Plaintiff's counsel that it had retained forensic computer specialist Mark Lanterman of Computer Forensic Services, Inc. ("CFS"), and asked Plaintiff to request from the FBI the forensic images it had taken during its investigation. (Id., Ex. 27 (Letter), at 825.) Plaintiff's counsel stated that they would not request the FBI's images "unless and until appropriate confidentiality agreements necessary to ensure compliance with federal banking and privacy laws ha[d] been executed." (Id., Ex. 28 (E-mail Exchange), at 840.) Plaintiff's counsel also expressed "dismay[]" that it had taken Defendant five months to issue its preliminary coverage decision. (Id.) In response, Defendant's counsel noted that Defendant had been "exhausting all attempts to obtain analysis and results concerning th[e] incident from other sources who may have conducted investigations closer in time to the incident." (Id. at 839.) He stated that, rather than conducting its own investigation, Defendant could simply have determined that Plaintiff had not met its burden to establish coverage or waited until the FBI concluded and released its investigation. (Id.)

On May 21, Plaintiff's counsel informed Defendant's counsel that he had recently learned that Plaintiff's outside IT provider, Kiel Zinter, had sent documents to the FBI on November 15, including logs and reports showing that the computer had been infected with a virus, and information related to the DDoS attack. (Id., Ex. 16 (Letter), at 893–94.) He forwarded those documents to Defendant's counsel on May 23 and apologized for not providing them sooner. (Id.) On June 13, Defendant's counsel acknowledged receipt of the documents but stated that it would still be necessary for Mr. Lanterman to have access to the FBI's forensic images. (Id., Ex. 29 (Letter), at 1073.) One week later, Plaintiff's counsel

informed Defendant's counsel that it had the hard drive in the condition it was in at the time of the loss.  (Id., Ex. 30 (E-mail), at 1288.)  Plaintiff agreed to provide the hard drive to Mr. Lanterman for examination under certain conditions, including after a confidentiality agreement was executed.  (Id., Ex. 31 (E-mail).)

Mr. Lanterman received the hard drive on August 8, and issued his report on October 10.  (Id., Ex. 32 (Forensic Services Report), at 1399.)  His report states the following:

**Introduction of Zeus Virus**

The analysis identified an email message, sent to the address "bellinghambank@farmers.net", which contained a hyperlink to a malicious webserver.  CFS further determined that this email had been read and the embedded link clicked on.

. . . .

The user's action of clicking on the hyperlink ultimately lead to the download of multiple files associated with the Zeus virus.

. . . .

**Understanding the Zeus Virus**

. . . .

Once a user accesses the malicious webserver and consequently installs the virus, Zeus then periodically checks for instructions from the criminal. Hackers post code to the compromised web servers that is later downloaded and executed on the victim's computer. . . .

Zeus often remains dormant until a user accesses a financial services web site. Once Zeus identifies financial activity, it will then collect confidential data to include a log of all keystrokes and screenshots.  This compromised data is then transmitted to the hacker.

The hacker then uses this data to initiate illegitimate financial transactions . . . .

. . . .

**Anti-virus Software**

. . . .

The analysis revealed that [Zeus] was detected on October 13, 2011.  Given [Symantec's] settings, it is more likely than not that Symantec notified the user of the infection.  The analysis revealed that [Zeus] was quarantined on October 18, 2011 but the infection was never completely removed by Symantec Antivirus.  Given [Symantec's] settings, it is more likely than not that Symantec notified the user of the quarantine. . . . Once [Zeus] executed, it remained resident, ultimately downloading a rash of subsequent infections that resulted in the unauthorized ACH transactions.  The continued use of the computer after receiving multiple virus warnings is contrary to generally accepted computer security practices.

Three additional malicious executable files, downloaded automatically by [Zeus], still reside on the system.  There is no evidence these files were detected by Symantec.  [One of the files] resulted in the download of . . . a virus.  This file . . . was downloaded and launched on October 26, 2011.  This file is considered to be directly responsible for the unauthorized wire transfers.

. . . .

Symantec Antivirus failed to identify these additional viruses.  It was determined that Symantec Antivirus was configured to complete a full scan once weekly.  Further, Symantec "Proactive Threat Protection" was disabled due to the fact that it was last updated July 30, 2008.  This left the system vulnerable to viruses created after 2008. . . . Generally accepted security practices would include daily virus scans and ensuring the virus definitions are current.

**Overview of Prior Infections**

Additionally, the system was previously compromised on August 8, 2011.  Symantec Antivirus, however, successfully removed that infection.  This demonstrates that the computer has a history of vulnerabilities due to user activity.  The user(s) was also aware of this compromise after receiving Symantec's alert.

**Computer Usage Patterns**

After establishing a chronology for the deployment of the Zeus virus executable file, CFS further analyzed the system to identify usage patterns that contributed to the compromise.

As described above, CFS reviewed email activity on the system and was able to identify the specific message containing the malicious hyperlink. Other messages within the Outlook Express inbox also suggest that the email application was being used for purposes other than FedLink. For instance, the email account was used to order and track company purchases. This is contrary to generally accepted security practices. The use of email on a computer that's purpose is to initiate FedLink transactions resulted in that system's compromise. Additionally, CFS determined that messages in the spam folder had been opened or read. Spam is a typical vehicle for malware.

CFS recovered and analyzed nearly one million URLs from Internet browser histories on the system. . . . Much of the history was found to relate to activity other than banking. For example, the user "FedLine" visited Facebook.com multiple times, with and without private browsing activated, before and after the initial infection. . . . This is contrary to generally accepted computer security practices.

CFS also determined that the administrator user accounts, "Administrator" and "FedLine", were not password protected. This would have allowed the virus to execute itself as an administrator without the need of a password. This is contrary to generally accepted computer security practices.

**Conclusions**

After a thorough review CFS is able to provide the following conclusions:

- The FedLine computer was used for email and personal activity such as web browsing.
- The Administrator and FedLine user accounts on the system were not password protected.
- Symantec Antivirus was configured to warn the user of threats.
- Symantec Antivirus "Proactive Threat Protection" was disabled.
- User activity resulted in the download and execution of the Zeus virus.
- Symantec Antivirus notified the user of the Zeus infection on October 13, 2011 and October 18, 2011. The computer remained in use after these warnings.

14

- Symantec Antivirus failed to remove the persistent Zeus Trojan in a timely manner.
- Multiple viruses exist on the system.

(Id. at 1400–06.)

On October 11, as part of its "supplemental phase of its coverage investigation," Defendant made eighteen additional document requests of Plaintiff pursuant to Section 7(d) of the Bond. (Id., Ex. 33 (Letter), at 1392–93.) These requests sought Plaintiff's policies relating to FedLine, policies regarding employee training and use of computers, policies regarding wire transfers, FedLine manuals, anti-virus program manuals, and documents provided by the Federal Reserve, among other things. (Id.) Plaintiff objected, stating that Section 7(d) only requires the production of "'pertinent records,'" and that none of the requested documents were pertinent to the coverage determination. (Id., Ex. 34 (Letter), at 1427.) On October 19, Defendant sent a letter explaining its position that, especially in light of Mr. Lanterman's report, the documents were necessary to determine the "'direct cause'" of the loss and whether any exclusions applied. (Id., Ex. 35 (Letter), at 1439–40.) On November 19, Plaintiff's counsel reiterated its view that the requested documents were not relevant to coverage under Insuring Agreement (H) and that it did not intend to provide them. (Id., Ex. 36 (Letter), at 1490.) However, Plaintiff submitted its responses to the document requests on December 17, noting that several of the documents were publicly available or had to be obtained from the FDIC or with the consent of the Federal Reserve. (Id., Ex. 37 (Letter), at 3088–92.) Plaintiff stated that there was only one document that it had the ability to release, and that the document could only be released subject to a confidentiality agreement. (Id. at 3088, 3092.)

15

Defendant issued its coverage decision on March 6, 2013.  (Id., Ex. 39 (Letter).)

Defendant determined that the loss was not covered by the Bond based upon the employee

exclusions in Section 2(h) and 2(bb)(17), the exclusion for theft of confidential information

in Section 2(bb)(4), and the exclusion for mechanical breakdown or deterioration of a

computer system in Section 2(bb)(12).  (Id. at 3208–09.)

### F.    Communications With the Minnesota Department of Commerce

Meanwhile, on October 26, 2012, counsel for Plaintiff sent a six-page letter to the

Department of Commerce ("DOC"), which states in relevant part:

> The State Bank of Bellingham has been struggling for close to a year on a
> claim under a Financial Institution Bond issued by BancInsure.  Kevin
> Murphy of the Minnesota Bankers Association is aware of this claim and has
> discussed it with the [B]ank.  He suggested that the [B]ank consider filing a
> complaint with your department.  As it appears the Bank is no closer to seeing
> this claim resolved than it was months ago, please consider this the Bank's
> formal complaint against BancInsure for its actions and delay in handling the
> claim discussed below. . . .
>
> . . . .
>
> This loss occurred and was reported a year ago.  Since then, the Bank has
> submitted the Proof of Loss and supporting documentation, responded in
> detail to follow-up questions and provided a DVD of the premises, provided
> copies of information its IT consultant provided the FBI, and even let the
> pertinent hard drive out of its possession to allow BancInsure to conduct a
> forensic analysis.  Now that the analysis is complete and shows that a covered
> loss occurred in the method the Bank contended, BancInsure requests
> extensive documents that have no bearing on whether the loss is within policy
> coverage.
>
> As the foregoing indicates, the Bank is rightfully concerned that these latest
> requests are simply another step in an ongoing pattern of delay.  And while
> the latest letter from BancInsure's attorney once again seeks to place the
> blame for delay on the Bank, the Bank certainly invites the Division or its
> investigator to see what BancInsure requested from the Bank and what the
> Bank provided in response to those specific requests.

> We believe BancInsure's actions in handling this claim are unacceptable and
> plainly violate the Minnesota Claims Practices statutes, if not the bad faith
> laws. Therefore, the State Bank of Bellingham requests the Commissioner
> enter an administrative order fining BancInsure and ordering payment of the
> claim to the full extent of the coverage afforded the Bank, together with
> interest from the date of loss and legal expenses.
>
> Any assistance you can provide the Bank to conclude this Bond Claim with
> BancInsure would be greatly appreciated.

(Bye Decl. dated Oct. 18, 2013 [Doc. No. 18] ("First Bye Decl."), Ex. A (Letter), at 1, 5–6.)

The DOC forwarded the letter to Defendant on December 19 and asked for a

response. (Dorothy Aff., Ex. 25 (Letter).) On the same day, the DOC sent a letter to

Plaintiff with the following information:

> Please take note that the Department's authority is limited to the
> determination of a licensee's compliance with Minnesota law and/or policy
> provisions, where applicable. Our Department cannot compel a company to
> make a claim settlement, obtain damages on your behalf, or determine who is
> correct in a factual dispute. This authority rests solely with a court of law. To
> obtain the remedies you seek, you may have to seek legal counsel.

(Supplemental Nilan Aff. dated Jan. 13, 2014 [Doc. No. 33] ("Supplemental Nilan Aff."),

Ex. 29 (Letter).)

Defendant responded on January 16, 2013, stating that "[t]he major themes in the

Bank's complaint to the Department are that BancInsure has unduly delayed the review of

this claim, and that it has not asked pertinent questions in its investigation of the claim."

(First Bye Decl., Ex. C (Letter), at 1.) Defendant explained its version of events and stated

its belief that the "concerns [were] unfounded" because the delays were due to Plaintiff's

"withholding of information critical to the investigation," and that the supplemental

information requests were "directly relevant to BancInsure's coverage analysis." (Id. at 1,

8.) According to Defendant, "[i]t is clear that the Bank has not submitted the 'necessary documentation required from the insured to establish entitlement to payment under a policy,'" as required under the Minnesota Fair Claims Practices Act.  (Id. (quoting Minn. Stat. § 72A.201, subd. 3(12)).)  In a subsequent letter to the DOC, dated March 13, 2013, Defendant noted that it had issued a supplemental coverage position to Plaintiff on March 6 in which it denied coverage for the Bank's claim "because of the Bond's exclusions for loss caused by an employee, theft of confidential information, and breakdown or deterioration of computer software systems."  (Id., Ex. F (Letter), at 3.)  Defendant also stated:

> Although the Bank has been represented by an outside law firm throughout this process, a second law firm recently informed us that the Bank will now commence litigation against BancInsure relating to this loss.  While we fully understand the Bank has a right to the assistance of the Department of Commerce, we believe it is also important to recognize that the Bank is a sophisticated consumer, and the Department's work should not be used to further a litigation strategy.
>
> We respectfully request that the Department at this time either (1) end this investigation based upon the complete record available, or at least (2) defer any further consideration until the Bank concludes the lawsuit it now intends to pursue.

(Id.)

After receiving this letter from Defendant, the DOC closed the file.  (See id., Ex. G (Letter).)  In a letter to Plaintiff, it stated:

> . . . For our investigation and assessment of this matter, our Department may only review the information and documentation that has been presented.  In this regard, the evidence does not appear to support our Department's pursuit of formal disciplinary action in this matter.  Additionally, it is our understanding that the company has denied the claim based on provisions contained in the bond and that your company will be [pursuing] litigation to debate the merits of the provisions cited given the events and circumstances

of the loss.  It would appear such a forum would be most appropriate for this dispute.

In light of the above, our Department does not have a sufficient basis to pursue this matter further and will close our file at this time.  Information from this file will be retained should similar situations arise.  Thank you for bringing this matter to our attention.

(<u>Id.</u>)

### G.     This Lawsuit

Plaintiff filed its Complaint in this matter on April 19, 2013, asserting a claim for breach of contract based on Defendant's denial of coverage under the Bond.  (Compl. ¶¶ 28–32.)  Plaintiff seeks an award of damages (including consequential damages), attorney's fees, and interest.  (<u>Id.</u> ¶ 3.)  In its Amended Answer and Counterclaim, Defendant denies breaching the Bond and asserts numerous affirmative defenses.  (<u>See</u> Def.'s Amended Answer and Counterclaim ¶¶ 31, 34–41.)  Defendant also asserts three counterclaims.  In Count I, Defendant seeks "a declaratory judgment that BancInsure owes no duty under the Bond to provide coverage for or indemnify the Bank for any of its losses described in the Complaint," and claims that it is entitled to recover the costs and expenses associated with the investigation.  (<u>Id.</u> ¶ 35.)  In Count II, Defendant asserts a claim for breach of contract based on Plaintiff's alleged failure to provide a complete and accurate Proof of Loss and its alleged failure to cooperate with Defendant.  (<u>Id.</u> ¶¶ 36–41.)  According to Defendant, this alleged breach of contract bars Plaintiff from recovering any of the loss it claims.  (<u>Id.</u> ¶ 41.)  Finally, in Count III, Defendant brings a claim for malicious prosecution based on Plaintiff's complaint to the DOC.  (<u>Id.</u> ¶¶ 42–46.)  Plaintiff denies these allegations and asserts numerous affirmative defenses.  (<u>See</u> Reply to

Counterclaims [Doc. No. 9], ¶¶ 31–47, 1–15; Stip. to Amend Answer and Counterclaim [Doc. No. 37], at 1.)

On October 18, 2013, Plaintiff filed its Motion for Partial Summary Judgment, for Attorney's Fees and for Punitive Damages.  In that motion, Plaintiff seeks dismissal of Defendant's malicious prosecution counterclaim on the grounds that its letter to the DOC constitutes "public participation" under Minnesota's Strategic Lawsuits Against Public Participation ("anti-SLAPP") statute, Minnesota Statutes § 554.01 et seq.  (Pl.'s Mem. Supporting Mot. for Partial Summ. J., for Attorney's Fees and for Punitive Damages [Doc. No. 17] ("Pl.'s Partial SJ Mem."), at 2.)[2]  Plaintiff notified the DOC of Defendant's counterclaim "alleging that [Plaintiff] did not have the right to seek the assistance of the [DOC]," and of the pending motion for partial summary judgment.  (Supplemental Bye Decl. dated Jan. 2, 2014 [Doc. No. 32], Ex. J (Letter).)  The DOC then informed Defendant that it "disagrees with your company's position" and that, "[s]hould your company continue with this position, [the DOC] may seek to pursue administrative sanctions for violations of Minn. Stat. § 72A.20, subd. 18 (b), as well as other applicable statutes."  (Id., Ex. K (Letter).)  Defendant argued that its position was that Plaintiff is liable for malicious

_____

[2]      On February 28, Plaintiff moved to amend its Complaint to add a bad-faith insurance claim under Minnesota Statutes § 604.18.  (Pl.'s Mot. to Amend to Add Claim Under Minn. Stat. § 604.18 [Doc. No. 44].)  This motion was fully briefed by both parties and heard by the Magistrate Judge on March 31 [Doc. No. 74].  The Magistrate Judge denied the motion without prejudice and without ruling on the merits based on Plaintiff's statement that its arguments on the motion overlapped with its arguments in support of its summary judgment motion.  (Order dated Aug. 6, 2014 [Doc. No. 112], at 1–2.)  The Magistrate Judge noted that the parties could revive their submissions if the disposition of the summary judgment motions "would favorably affect the outcome of the motion to amend."  (Id. at 2.)

prosecution not simply for contacting the DOC, but rather based on Plaintiff's continued request that the DOC order payment of the disputed claim in light of the DOC's December 19 letter to Plaintiff explaining the DOC's limited authority. (Supplemental Nilan Aff., Ex. 28 (Letter), at 1–2.) Plaintiff's motion was heard on January 24.

On April 25, 2014, Plaintiff moved for summary judgment on the remaining claims—i.e., Plaintiff's claim for breach of contract and Defendant's counterclaims for declaratory judgment and breach of contract. (Pl.'s Mem. in Support of Mot. for Summ. J. [Doc. No. 78] ("Pl.'s SJ Mem."), at 1.) On May 9, Defendant also moved for summary judgment on those claims. (Def.'s Mot. for Summ. J. [Doc. No. 88], at 1.) Both motions were heard on June 16.

## III.    DISCUSSION

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322–23; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50, 255 (1986). A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law. Anderson, 477 U.S. at 248. A dispute over a fact is "genuine" if "the

evidence is such that a reasonable jury could return a verdict for the non-moving party."

Id.

Although the party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed, Celotex Corp., 477 U.S. at 323, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256.  Thus, the movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.  No genuine issue of material fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

### A.    Malicious Prosecution

In its partial summary judgment motion, Plaintiff seeks dismissal, under Minnesota's anti-SLAPP statute, of Defendant's counterclaim for malicious prosecution.  The anti-SLAPP statute was enacted "to 'protect[] citizens and organizations from civil lawsuits for exercising their rights of public participation in government.'"  Middle-Snake-Tamarac Rivers Watershed Dist. v. Stengrim, 784 N.W.2d 834, 839 (Minn. 2010) (quoting Act of May 5, 1994, ch. 566, 1994 Minn. Laws 895, 895)).  Under the statute, a party may move "to dispose of a judicial claim on the grounds that the claim materially relates to an act of the moving party that involves public participation," Minn. Stat. § 554.02, subd. 1, and "the

responding party has the burden of proof, of going forward with the evidence, and of

persuasion on the motion," id. § 554.02, subd. 2(2).

Accordingly, once the moving party meets its "minimal burden" of "mak[ing] a

threshold showing that the acts that are 'materially' related to the responding party's claim

are themselves public participation," Stengrim, 784 N.W.2d at 841, "the court shall grant

the motion and dismiss the judicial claim unless the court finds that the responding party has

produced clear and convincing evidence that the acts of the moving party are not

immunized from liability under section 554.03," Minn. Stat. § 554.02, subd. 2(3) (emphasis

added).  Under that section, "[l]awful conduct or speech that is genuinely aimed in whole or

in part at procuring favorable government action is immune from liability, unless the

conduct or speech constitutes a tort or a violation of a person's constitutional rights."  Id.

§ 554.03.  While the clear-and-convincing-evidence burden is "heavy," it "is not

insurmountable for parties with meritorious claims."  Stengrim, 784 N.W.2d at 839.

If the moving party prevails, it is entitled to its attorney's fees and costs associated

with bringing the motion.  Minn. Stat. § 554.04, subd. 1.  The moving party is also entitled

to actual damages if it can demonstrate that the responding party brought the underlying

claim for purposes of harassment, inhibiting public participation, interfering with the

exercise of constitutional rights, or "otherwise wrongfully injur[ing] the moving party."  Id.

§ 554.04, subd. 2(b).  Finally, a court may award punitive damages if the moving party can

satisfy the requirements of Minnesota Statutes section 549.191.[3]  Id.

---

[3]      However, the moving party need not move to amend the pleadings as required
under that section.  Minn. Stat. § 554.04, subd. 2(b).

Here, the Court finds that Plaintiff has met its minimal burden of showing that its letter to the DOC constituted public participation, and that Defendant has failed to meet its higher burden of demonstrating that Plaintiff's conduct was not immunized from liability. Accordingly, Plaintiff is entitled to its attorney's fees and costs related to bringing its motion for partial summary judgment.  However, the Court declines to award Plaintiff actual or punitive damages.

### 1.     Public participation

Plaintiff has made a threshold showing that its letter to the DOC, which is the basis of Defendant's malicious prosecution claim, constituted public participation.  "Public participation" consists of "speech or lawful conduct that is genuinely aimed in whole or in part at procuring favorable government[4] action."  Minn. Stat. § 554.01, subd. 6.  The Minnesota Court of Appeals has stated that "the use of 'genuinely' requires an analysis of whether the speech was aimed at procuring favorable government action that is not solely determined by post-litigation statements in which the speaker asserts subjective intent that the speech was to procure such action."  Freeman v. Swift, 776 N.W.2d 485, 489 (Minn. Ct. App. 2009).

Here, Plaintiff argues that its letter to the DOC "was aimed solely at procuring favorable government action in its dispute with BancInsure."  (Pl.'s Partial SJ Mem., at 8.) In support of its argument, Plaintiff points to its request in the letter for "'any assistance you

---

[4]     "Government" is defined to "include[] a branch, department, agency, official, employee, agent, or other person with authority to act on behalf of the federal government, [Minnesota], or any political subdivision of [Minnesota] . . . ."  Minn. Stat. § 554.01, subd. 2.  There is no dispute in this case that the DOC is encompassed by this definition.

can provide the Bank to conclude this Bond Claim with BancInsure,'" (id.), and its request

that the DOC fine Defendant, (Pl.'s Reply Mem. Supporting Mot. for Partial Summ. J., for

Attorney's Fees, and for Punitive Damages [Doc. No. 28] ("Pl.'s Partial SJ Reply"), at 4).

Defendant, on the other hand, contends that the letter was not "public participation" because

the DOC has no authority to order one of the forms of relief sought by Plaintiff— "payment

of the claim to the full extent of the coverage afforded the Bank."  (Def.'s Mem. in Opp. to

Pl.'s Mot. for Partial Summ. J., for Attorney's Fees, and for Punitive Damages [Doc. No.

21] ("Def.'s Partial SJ Opp."), at 22.)  According to Defendant, "[t]he nature and purpose of

[Plaintiff's] speech are the exact opposite of the speech the statute seeks to protect, which is

speech 'genuinely aimed' at procuring a result the government audience can legitimately

grant," and instead Plaintiff's letter was meant to "coerc[e]" Defendant into paying the

claim.  (Id. at 22–23.)

The Court finds that Plaintiff's letter was aimed at procuring favorable government

action.  The letter describes what Plaintiff perceived to be Defendant's "delay in handling

the claim" in violation of the Minnesota Claims Practices statutes and bad faith laws, and it

plainly states as Plaintiff's goal the receipt of any assistance the DOC could provide to

conclude Plaintiff's claim with Defendant.  Because the intended result is expressly stated in

the letter and not based solely on Plaintiff's present statements of past subjective intent, the

Court also finds that it was genuine.  Defendant cites to no authority for the proposition that

the government's inability to provide every form of relief sought precludes Plaintiff from

invoking the anti-SLAPP statute, and the Court has found none.  Accordingly, the burden

shifts to Defendant to establish clear and convincing evidence that Plaintiff's actions are not immune from liability.

### 2.    Immunity

To meet its burden, the party responding to an anti-SLAPP motion must persuade the court with clear and convincing evidence—rather than relying on the allegations in its complaint—that the moving party's conduct is not immune under Minnesota Statutes section 554.03. <u>Leiendecker v. Asian Women United of Minn.</u>, 848 N.W.2d 224, 226, 233 (Minn. 2014), <u>as modified</u> Sept. 3, 2014. The responding party can do so "by establishing that the moving party's conduct or speech was not aimed in whole or in part at procuring favorable government action, that the conduct or speech constituted a tort, or that the conduct or speech violated another's constitutional rights." <u>Id.</u> at 229. The Minnesota Supreme Court in <u>Leiendecker v. Asian Women United of Minnesota</u> recently explained the discrepancy between this standard and the summary judgment standard:

> [T]he summary-judgment standard and the statutory framework for evaluating an anti-SLAPP motion are mutually inconsistent.
>
> For summary judgment motions, a court evaluates the evidence to determine whether there are any genuine issues of material fact and whether either of the parties is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03. An anti-SLAPP motion, by contrast, requires the court to make a finding about whether "the responding party has produced clear and convincing evidence that the acts of the moving party" are not immune. Minn.Stat. § 554.02, subd. 2(3). However, according to the immediately preceding provision, Minn.Stat. § 554.02, subd. 2(2), the responding party carries three distinct burdens "on the motion": the burden of proof, the burden of production, and the burden of persuasion. . . . Reading subdivisions 2(2) and 2(3) together, the responding party bears the burden to persuade the trier of fact—here, the district court— of the truth of a proposition—here, that the acts of the moving party are not immune—and if it does not do so, then the court <u>must</u> "grant the motion and dismiss the judicial claim," Minn.Stat. § 554.02, subd. 2(3). Under the anti-

> SLAPP statutes, therefore, the court is <u>required</u> to dismiss the claim, even in the face of genuine issues of material fact, if the responding party has failed to carry its burden of persuasion that the moving party is not immune by clear and convincing evidence.  Under a summary-judgment standard, by contrast, genuine issues of material fact <u>preclude</u> summary judgment.  Thus, the two standards, which operate differently when genuine issues of material fact exist, are incompatible with one another.

<u>Id.</u> at 231.  Accordingly, the court rejected the Minnesota Court of Appeals' statement in

<u>Nexus v. Swift</u> that, "if a party brings a motion for summary judgment asserting anti-

SLAPP immunity, the responding party is only 'required to produce clear and convincing

evidence in light of the Rule 56 standard for granting summary judgment.'"  <u>Id.</u> at 230

(quoting <u>Nexus v. Swift</u>, 785 F.W.2d 771, 782 (Minn. Ct. App. 2010)).[5]

Defendant argues that Plaintiff's conduct is not immune under Minnesota Statutes

section 554.03 because it constitutes the tort of malicious prosecution.  (<u>See</u> Def.'s Partial

SJ Opp., at 23.)  "[T]o state a claim for malicious prosecution a plaintiff must demonstrate

that: (1) the action was brought without probable cause or reasonable belief that the plaintiff

---

[5]      Because the Minnesota Supreme Court's opinion in <u>Leiendecker</u> was issued in June 2014, the parties briefed the motion using the standard articulated in <u>Nexus</u>.  (<u>See</u> Pl.'s Partial SJ Mem., at 8; Def.'s Partial SJ Opp., at 20–21.)  Defendant also relied on the lower court's holding in <u>Leiendecker</u> that the responding party need only allege facts, rather than produce evidence, that clearly and convincingly demonstrate that the moving party's actions are not immune.  (Def.'s Partial SJ Opp., at 21 (citing <u>Leiendecker v. Asian Women United of Minn.</u>, 834 N.W.2d 741, 751 (Minn. Ct. App. 2013)).  That holding was, however, reversed by the Minnesota Supreme Court, as discussed above.

Defendant filed a copy of the Minnesota Supreme Court's opinion in <u>Leiendecker</u> with this Court on June 30 and stated its belief that the opinion was relevant to Plaintiff's motion for partial summary judgment.  (Letter dated June 30, 2014 [Doc. No. 110].)  Defendant asked the Court to advise counsel if it would like additional briefing.  (<u>Id.</u>)  However, neither party sought leave to file supplemental briefing, and the Court finds that additional briefing would be unnecessary.

would ultimately prevail on the merits; (2) the action must be instituted and prosecuted with malicious intent; and (3) the action must terminate in favor of the defendant." <u>Kellar v. VonHoltum</u>, 568 N.W.2d 186, 192 (Minn. Ct. App. 1997) (citation omitted).  Moreover, in order to trigger the tort of malicious prosecution, "some formal legal action must be instituted." <u>Stead-Bowers v. Langley</u>, 636 N.W.2d 334, 341 (Minn. Ct. App. 2001) (finding that a criminal charge or indictment would constitute "formal legal action" sufficient to trigger a malicious prosecution claim, but that the initiation of a criminal investigation alone would not).

The parties, as an initial matter, dispute whether Plaintiff's letter to the DOC can even constitute action sufficient to form the basis of a malicious prosecution claim.  (See Pl.'s Partial SJ Mem., at 8–10; Def.'s Partial SJ Opp., at 24–26; Pl.'s Partial SJ Reply, at 5–8.)  However, the Court need not reach this issue.  Rather, even assuming that Plaintiff's letter to the DOC was conduct that could trigger the tort, Defendant has failed to present clear and convincing evidence that Plaintiff's actions constituted malicious prosecution.

### a.     Probable cause

Defendant has not demonstrated that Plaintiff lacked probable cause to send the letter to the DOC.  "'Probable cause for pursuing a civil action consists of such facts and circumstances as will warrant a cautious, reasonable and prudent person in the honest belief that his action and the means taken in prosecution of it are just, legal, and proper.'" <u>Mendota Heights Assocs. v. Friel</u>, 414 N.W.2d 480, 484 (Minn. Ct. App. 1987) (quoting <u>First Nat'l Bank of Omaha v. Marquette Nat'l Bank of Minneapolis</u>, 482 F. Supp. 514, 523 (D. Minn. 1979), <u>aff'd</u>, 636 F.2d 195 (8th Cir. 1980)).  Moreover, to prevail on a claim for

malicious prosecution, "the want of probable cause must be very palpable." Id. (citing

Virtue v. Creamery Package Mfg. Co., 142 N.W. 930, 936 (Minn. 1913); Eickhoff v.

Fidelity & Cas. Co., 76 N.W. 1030, 1031 (Minn. 1898)).

Defendant's sole argument regarding probable cause is the same as its argument

regarding public participation—i.e., that because Plaintiff sought relief that the DOC was

without authority to grant, Plaintiff lacked probable cause or a reasonable belief that it

would prevail.  (Def.'s Partial SJ Opp., at 26.)  Plaintiff, on the other hand, argues that it had

a reasonable belief that the DOC could help the parties resolve their dispute because the

circumstances of the loss fall directly under the coverage provided by the Bond, yet

Defendant had been evaluating the claim for a year.  (Pl.'s Partial SJ Mem., at 11.)

According to Plaintiff, Minnesota's unfair claims handling statutes make it unlawful for an

insurer to fail to issue a coverage decision within a reasonable time after the proof of loss is

submitted or to demand information that is not relevant to the claims decision, and the DOC

enforces these statutes.  (Pl.'s Partial SJ Reply, at 10 (citing Minn. Stat. § 72A.20, subd.

12(5); id. § 74A.201, subds. 1, 3(6), 4(9)).  Moreover, Plaintiff points out, the DOC's

website invites insureds to seek the DOC's assistance in resolving disputes with their

insurers by filing a written complaint.  (Id.; First Bye Decl., Ex. I.)

Defendant has not established by clear and convincing evidence that Plaintiff lacked

probable cause to seek assistance from the DOC through its letter.  As discussed above, the

letter describes what Plaintiff perceived to be Defendant's "delay in handling the claim" in

violation of the Minnesota Claims Practices statutes and bad faith laws, and it plainly states

as Plaintiff's goal the receipt of any assistance the DOC could provide to Plaintiff.  Based

on the unfair claims practices statutes and the DOC's website, Plaintiff's belief that it could obtain assistance by submitting its written complaint to the DOC was reasonable. Defendant even acknowledged in its follow-up letter to the DOC on March 13, 2013, that Plaintiff had a right to the DOC's assistance. Accordingly, any supposed want of probable cause evidenced by the fact that the DOC may not have been able to provide every form of relief referenced in the letter is not "very palpable," and Defendant's claim fails on this element.

### b.    No malicious intent

Defendant's claim also fails for a want of evidence of malicious intent. "[T]o prevail on a malicious-prosecution claim, a plaintiff must prove, at a minimum, that the defendant knew that its actions were wrong." Hirtzinger v. Pinnacle Airlines, Inc., No. 06-CV-1609 (PJS/RLE), 2008 WL 835644, at *16 (D. Minn. Mar. 27, 2008) (citing Allen v. Osco Drug, Inc., 265 N.W.2d 639, 645 (Minn. 1978)), aff'd on other grounds, 310 Fed. App'x 949 (8th Cir. 2009) (per curiam).

Here, Defendant argues that Plaintiff pursued its complaint with the DOC "with the malicious intent to coerce BancInsure to abandon its investigation" and pay the claim. (Def.'s Partial SJ Opp., at 27.) Defendant argues that, at the time Plaintiff complained, it had misrepresented that it had not conducted an investigation, had withheld the hard drive, had seen Mr. Lanterman's report detailing the security deficiencies, and had received Defendant's supplemental document requests; and that the timing of the letter therefore demonstrates Plaintiff's malicious intent. (Id. at 28.) Defendant also points out that Plaintiff did not notify Defendant of the letter when it was sent. (Id.)

30

The Court finds that Defendant has not provided clear and convincing evidence of malicious intent on Plaintiff's part.  It appears, as Plaintiff notes, that Defendant had access to Plaintiff's IT consultant's images and the hard drive at the time the letter was sent, (see Pl.'s Partial SJ  Reply, at 13), and that Mr. Lanterman had already issued his report.  Despite having this information, Defendant still had not issued its coverage decision, but instead had made supplemental document requests, and the delay was the basis of Plaintiff's letter. Moreover, the DOC's website states that it will contact the parties named in an insured's complaint.  Accordingly, there is no evidence—let alone clear and convincing evidence— that Plaintiff knew its actions were wrong when it sent the letter requesting the DOC's assistance.

### c.        Neutral outcome

Finally, Defendant contends that the DOC's proceedings terminated in favor of Defendant because the DOC stated that the evidence did not support pursuit of formal disciplinary action and decided not to grant Plaintiff any relief.  (See Def.'s Partial SJ Opp., at 29.)  Plaintiff, on the other hand, argues that the proceedings were not resolved in Defendant's favor because the DOC only stated that the pursuit of disciplinary action was not appropriate "'at this time,'" (Pl.'s Partial SJ Mem., at 12), and that a court would be the "'most appropriate'" forum for the parties' dispute, (Pl.'s Partial SJ Reply, at 15).  In fact, Plaintiff claims that the proceedings resulted in Defendant finally announcing its coverage decision, which is what Plaintiff sought.  (Id.)

The Court finds that the DOC's proceedings terminated in a neutral manner. Although the DOC stated that it would not pursue formal disciplinary action against

31

Defendant based on the evidence before it, the DOC also acknowledged that there was another forum available for resolving the issue.  Even if this outcome were considered to be favorable to Defendant, Defendant's claim fails because it has not satisfied the first two elements of malicious prosecution by clear and convincing evidence.  Therefore, Defendant has not met its burden under the anti-SLAPP statute, and its counterclaim for malicious prosecution must be dismissed.

### 3.    Attorney's fees and costs

As noted above, a moving party who prevails on a motion for dismissal based on the anti-SLAPP statute is entitled to an award of attorney's fees and costs associated with bringing the motion.  Minn. Stat. § 554.04, subd. 1.  The moving party is also entitled to actual damages if it can demonstrate that the opposing party brought the underlying claim for purposes of wrongfully injuring the moving party.  Id. § 554.04, subd. 2(b).  However, an award of punitive damages is permissive and can only be awarded if the moving party satisfies the requirements of Minnesota Statutes section 549.191.  Id.  One such requirement is meeting the standard in section 549.20:

    (a)    Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.

    (b)    A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:

        (1)    deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or

(2)     deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

Id. § 549.20, subd. 1.

In its motion, Plaintiff argues that—should it prevail—it is entitled to an award of both attorney's fees and punitive damages. (Pl.'s Partial SJ Reply, at 13.) Plaintiff does not seek actual damages. As for punitive damages, Plaintiff asserts that Defendant retaliated against Plaintiff for complaining to the DOC "by filing a baseless malicious prosecution claim," thereby deliberately disregarding Plaintiff's rights and entitling Plaintiff to an award of $25,000. (Id. at 16; see Pl.'s Partial SJ Mem., at 13–14.) Although Defendant does not dispute that Plaintiff is entitled to its attorney's fees if it prevails on the motion, Defendant does argue that Plaintiff has failed to establish its entitlement to punitive damages. (Def.'s Partial SJ Resp., at 29–30.) Specifically, Defendant contends that Plaintiff has not demonstrated that Defendant intended to threaten Plaintiff's rights by asserting the counterclaim, and that, in fact, Defendant sought to protect its own rights to make coverage determinations free from coercion. (Id. at 30–31.) Moreover, Defendant argues, the amount requested by Plaintiff is arbitrary. (Id. at 31.)

Because Plaintiff is the moving party, and because the Court finds that Plaintiff has prevailed on its anti-SLAPP motion, the Court will award Plaintiff its reasonable attorney's fees and costs associated with bringing the motion. Accordingly, within ten days of the date of this Order, Plaintiff shall submit an affidavit documenting its reasonable attorney's fees and costs. Defendant may submit a responsive affidavit within ten days thereafter. However, the Court declines to award Plaintiff punitive damages because Plaintiff has not

provided clear and convincing evidence that Defendant acted in deliberate disregard of Plaintiff's rights by asserting its malicious prosecution counterclaim. While Defendant was ultimately unsuccessful on that claim, Defendant presented at least a colorable basis for it. For these reasons, Plaintiff's partial summary judgment motion is granted in part and denied in part.

**B.      Breach of the Bond**

Resolution of the remaining claims—Plaintiff's claim for breach of contract based on Defendant's denial of coverage, and Defendant's counterclaims for a declaratory judgment that it owes no coverage and for breach of contract based on Plaintiff's alleged failure to cooperate with Defendant—depends on the applicability of various provisions of the Bond. State law governs the interpretation of insurance policies, Nat'l Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc., 346 F.3d 1160, 1164 (8th Cir. 2003), and the parties agree that Minnesota law controls, (Pl.'s SJ Mem., at 5; Def.'s Mem. Supporting Its Mot. for Summ. J. and Opposing Pl.'s Mot. for Summ. J. [Doc. No. 89] ("Def.'s SJ Mem."), at 25). Under Minnesota law, the interpretation and construction of an insurance policy is a matter of law for the court, Watson v. United Servs. Auto. Ass'n, 566 N.W.2d 683, 688 (Minn. 1997), and "[g]eneral principles of contract interpretation apply," Lobeck v. State Farm Mut. Auto. Ins. Co., 582 N.W.2d 246, 249 (Minn. 1998). "While the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions." Travelers Indem. Co. v. Bloomington Steel & Supply Co., 718 N.W.2d 888, 894 (Minn. 2006) (citation omitted).

34

As an initial matter, the parties dispute whether <u>contra proferentem</u>—the doctrine under which ambiguous insurance policy terms are construed in favor of the insured— applies to financial institution bonds. (<u>See</u> Pl.'s SJ Mem., at 5–11; Def.'s SJ Mem., at 26– 27; Pl.'s Mem. in Reply Supporting Its Summ. J. Mot. and Opposing Def.'s Summ. J. Mot. [Doc. No. 99] ("Pl.'s SJ Reply"), at 2–3; Def.'s Reply Mem. Supporting Its Mot. for Summ. J. [Doc. No. 103] ("Def.'s SJ Reply"), at 2–3.) However, the Court need not address that issue because there is no dispute that Plaintiff's loss falls under the coverage provided in Insuring Agreement (H),[6] and even if one of the asserted exclusions was implicated in this case, Defendant has failed to show that the excluded cause was the overriding cause of Plaintiff's loss. In addition, Defendant has failed to demonstrate substantial prejudice resulting from Plaintiff's alleged breach of the Bond's cooperation provisions. Accordingly, Defendant is liable for coverage of Plaintiff's loss, as well as for prejudgment interest.

### 1. Coverage liability

Defendant argues that the Bond's exclusions for "loss caused by an Employee" (Section 2(h) and 2(bb)(17)), "loss resulting directly or indirectly from theft of confidential information" (Section 2(bb)(4)), and "loss resulting directly or indirectly from mechanical failure . . . [or] gradual deterioration" of a computer system (Section 2(bb)(12)), preclude coverage of Plaintiff's claim. As for the employee exclusion, Defendant argues that "Bank

---

[6]     Defendant's 30(b)(6) deposition witness agreed that, unless an exclusion applies, Plaintiff's loss is covered by Insuring Agreement (H). (Second Bye Decl., Ex. D (Cross Dep. 27:5–8).)

employees caused the loss by intentionally disregarding Bank policies, Federal Reserve

policies, and good banking practices." (Def.'s SJ Mem., at 30.)  Specifically, Defendant

points to the employees' downloading of the Zeus virus through spam email, the

employees' continued use of the computer after it detected a virus, the employees' failure to

enable and update antivirus software, the employees' failure to password-protect the

FedLine user accounts, Ms. Kirchberg's use of another employee's password and token to

complete a transfer on the day preceding the loss, and Ms. Kirchberg's failure to remove the

tokens from the computer or shut down the computer on the day preceding the loss.  (See id.

at 30–35; Def.'s SJ Reply, at 4–5.)  According to Defendant, "[t]hese actions caused the loss

by opening the door for cyber thefts."  (Def.'s SJ Reply, at 6.)  As for the theft of

confidential information exclusion, Defendant argues that the employees' passwords and

pass phrases were confidential, that those passwords and pass phrases were used to make

the transfers, and, therefore, that "[t]he theft of [the] passwords and pass phrases caused the

loss."  (Def.'s SJ Mem., at 39.)  Finally, as for the mechanical failure or gradual

deterioration exclusion, Defendant asserts that, because Proactive Threat Protection was

disabled and its definitions not updated, the computer's antivirus software gradually

deteriorated and allowed malware to be downloaded, which led to the unauthorized

transfers.  (See id. at 41.)  To the contrary, Plaintiff argues that none of these exclusions

were triggered by the circumstances of the loss, but that even if they had been, Defendant

cannot satisfy its burden under Minnesota's concurrent causation doctrine of establishing

that an excluded cause was the "overriding" cause of the loss.  (See Pl.'s SJ Mem., at 16–

27.)

The Court agrees with Plaintiff.  When there are multiple causes of an insured's loss, one of which is a "covered peril" and the other of which is an "excluded peril," Minnesota's concurrent causation doctrine provides that the availability of coverage or the applicability of the exclusion depends on which peril was the "'overriding cause'" of the loss.  Friedberg v. Chubb & Son, Inc., 691 F.3d 948, 952 (8th Cir. 2012) (quoting Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co., 383 N.W.2d 645, 653 (Minn. 1986)).  In Friedberg v. Chubb & Son, Inc., the Eighth Circuit recently examined the Minnesota Supreme Court cases that form the basis of this doctrine:  Henning Nelson Construction Co. v. Fireman's Fund American Life Insurance Co., 383 N.W.2d 645 (Minn. 1986), the case that coined the term "overriding cause"; and Fawcett House, Inc. v. Great Central Insurance Co., 159 N.W.2d 268 (Minn. 1968), and Anderson v. Connecticut Fire Insurance Co., 43 N.W.2d 807 (Minn. 1950), the two cases the court in Henning relied upon.  The Eighth Circuit summarized those cases as follows:

> In Henning, an insurer denied the plaintiff coverage for the collapse of the foundational wall of a construction project.  The court rejected the insurer's argument to apply any of three exclusions, including one that excluded coverage if loss was "caused by, resulting from, contributed to, or aggravated by" water below the surface of the ground.  But the court also held in the alternative that "[e]ven if one of the three causes discussed above had been established," the insurer could not deny coverage, because "the testimony established there were eight possible causes of the collapse, but no one factor was considered to be the overriding cause."
>
> . . . . Fawcett House involved an insurance claim arising from destruction of the plaintiff's heating and plumbing system after vandals had entered and turned off the electricity.  The vandalism caused a "freeze-up" of the system.  The plaintiff's policy covered "direct loss by Vandalism and Malicious Mischief" but excluded "any loss resulting from change in temperature or humidity."  The Supreme Court of Minnesota held that the exclusion did not apply, and reasoned that "loss from 'change in temperature or humidity'

encompasse[s] only losses directly caused by such changes, not those
incidentally aggravated by a change in temperature but which would not have
occurred except for acts of vandalism."   Anderson turned on whether a
building was damaged by a windstorm, a covered peril, or a blizzard, an
excluded cause.   The Minnesota court concluded that coverage applied
because a jury reasonably could have found the windstorm to be the "efficient
and proximate cause" of the building's collapse.  Although wind was "not the
sole cause," the windstorm weakened the building and resulted in a "collapse
[that] would not have taken place had not the structure first been weakened by
the wind."

Fawcett House and Anderson illustrate what the court in Henning meant by
"overriding cause."   According to Henning, the earlier decisions hold that
even where an excluded peril "contributed to the loss," an insured may
recover if a covered peril is what Anderson called "the efficient and
proximate cause" of the loss.  Conversely, it follows that if an excluded peril
is the efficient and proximate cause of the loss, then coverage is excluded.  An
"efficient and proximate cause," in other words, is an "overriding cause."

Friedberg, 691 F.3d 948, 952 (8th Cir. 2012) (internal citations omitted).

At issue in Friedberg was a claim for coverage for water damage to a home under an

insurance policy that covered "'all risk of physical loss'" except for certain exclusions,

including for any loss caused by "'[f]aulty planning, construction or maintenance.'"  Id. at

950.  Based on the cases discussed above, the Eighth Circuit concluded that the policy's

exclusion for loss caused by faulty construction precluded coverage:

The faulty construction of the Friedbergs' house, like the vandals in Fawcett
House and the windstorm in Anderson, was the efficient and proximate cause
of the loss.  But for the faulty construction, the water damage would not have
taken place.  Once the house was plagued with faulty construction, it was a
foreseeable and natural consequence that water would enter.  Although water
intrusion played an essential role in the damage to the Friedbergs' house, it
was not an independent and efficient cause of the loss.  The water's role was
comparable to the temperature change in Fawcett House and the snowfall in
Anderson, neither of which precluded the coexistence of an efficient and
proximate cause. . . .

Id. at 952.

38

Applying this precedent to the present set of facts, this Court finds that the computer systems fraud was the efficient and proximate cause of Plaintiff's loss.  But for the hacker's fraudulent conduct, the $485,000 would not have been transferred.  Conversely, neither the employees' violations of policies and practices (no matter how numerous), the taking of confidential passwords, nor the failure to update the computer's antivirus software was the efficient and proximate cause of Plaintiff's loss.  Assuming all of these circumstances existed as Defendant argues, it was not then a "foreseeable and natural consequence" that a hacker would make a fraudulent wire transfer.  Thus, even if those circumstances "played an essential role" in the loss, they were not "independent and efficient causes" of the loss.  In other words, without the fraudster's actions, there would have been no loss even if all of the other circumstances existed.  Therefore, according to <u>Friedberg</u>, <u>Fawcett House</u>, <u>Anderson</u>, and <u>Henning</u>, the computer systems fraud was the overriding cause of Plaintiff's loss.

Defendant's arguments to the contrary are unavailing.  First, Defendant argues that the Eighth Circuit in <u>Empire Bank v. Fidelity & Deposit Co.</u>, 27 F.3d 333 (8th Cir. 1994), held that the employee exclusion does not require that the employee's conduct be the only cause of the loss in order for the exclusion to apply.  (Def.'s SJ Mem., at 36.)  However, as Plaintiff notes, neither does the concurrent causation doctrine require that the employee's conduct be the sole cause of the loss in order for the exclusion to apply; rather, it requires only that the employee's conduct be the "overriding cause."[7]  (<u>See</u> Pl.'s SJ Reply, at 4.)

---

[7]      In addition, <u>Empire Bank</u> is also inapposite because it involved Missouri law.  <u>See</u> 27 F.3d at 334.

Second, Defendant asserts that the concurrent causation doctrine cannot apply in the context of the theft of confidential information or mechanical failure or gradual deterioration exclusions because those exclusions include losses "indirectly" caused by those perils.  (See Def.'s SJ Mem., at 40–41.)  This argument, too, is unavailing.  The exclusion for faulty construction at issue in Friedberg applied to "'any loss that is contributed to, made worse by, or in any way results from that peril.'"  691 F.3d at 951.  Nevertheless, the Eighth Circuit conducted a thorough analysis to determine whether that excluded peril was the overriding cause of the loss.  See id. at 952.  Only after determining that faulty construction was, in fact, the overriding cause did the court determine that the exclusion applied.  See id.

Finally, Defendant argues that no Minnesota court has applied the concurrent causation doctrine to a financial institution bond, and that other courts have declined to do so.  (Def.'s SJ Reply, at 8–9.)  However, Defendant cites to no Minnesota cases in which a court has determined that the exclusion cannot apply to financial institution bonds, and none of the cases cited by Defendant applies Minnesota law.  See Universal Mortg. Corp. v. Wurttembergische Versicherung AG, 651 F.3d 759, 762 (7th Cir. 2011) (applying Wisconsin law); Empire Bank, 27 F.3d at 334 (applying Missouri law); Bay Area Bank v. Fidelity & Deposit Co., 629 F. Supp. 693, 697 (N.D. Cal. 1986) (applying California law).  Moreover, the state law in the one case cited by Defendant where the court declined to apply the doctrine because it would nullify the exclusions is materially different than Minnesota's law—it did not require that a concurrent cause be the "overriding cause," but only "a" cause of the loss.  See Bay Area Bank, 629 F. Supp. at 697–98 (applying

40

California's concurrent causation doctrine, which "provides that 'coverage under a . . . policy is equally available to an insured whenever an <u>insured</u> risk constitutes simply <u>a</u> concurrent proximate cause of the injury'") (citation omitted). The courts in the other two cases cited by Defendant for the proposition that courts do not apply the concurrent causation doctrine to financial institution bonds simply did not mention "concurrent causation" at all, so it is not clear that those courts would find that the concurrent causation doctrine could never apply to a financial institution bond. <u>See</u> <u>Universal Mortg. Corp.</u>, 651 F.3d at 761–64; <u>Empire Bank</u>, 27 F.3d at 335–36.

Because Defendant has presented no set of facts from which a reasonable jury could find that one of the excluded perils—and not the computer systems fraud—was the overriding cause of Plaintiff's loss, Plaintiff is entitled to summary judgment on its claim for breach of contract and on Defendant's claim for a declaratory judgment that it is not liable for coverage. Accordingly, Defendant owes Plaintiff $480,000 under the Bond, which is the amount of the loss less the $5,000 deductible.

## 2.     Failure to cooperate

The parties also each seek summary judgment on Defendant's counterclaim for breach of the Bond's cooperation provisions. In this type of claim, "the insurer has the burden of proving a substantial and material lack of cooperation resulting in substantial prejudice to its position." <u>Rieschl v. Travelers Ins. Co.</u>, 313 N.W.2d 615, 617 (Minn. 1981) (citation omitted). Accordingly, it is not enough to simply show a lack of cooperation; rather, the insurer must also show that the lack of cooperation resulted in substantial prejudice. <u>Id.</u> at 618 (citing <u>White v. Boulton</u>, 107 N.W.2d 370, 372 (Minn. 1961)).

41

Although the question of whether an insured has breached a cooperation clause is a question of fact, id. at 617, summary judgment is appropriate in this case because Defendant has not presented evidence from which a reasonable jury could find that Defendant suffered substantial prejudice due to Plaintiff's actions.  See Parr v. Gonzalez, 669 N.W.2d 401, 407–08 (Minn. Ct. App. 2003) (affirming the district court's award of summary judgment against the insurer where it "failed to present any evidence raising a material fact question as to whether [the insured's failure to cooperate] substantially prejudiced [the insurer's] position").

As discussed above, Section 7 of the Bond required Plaintiff, "[u]pon the Company's request" to "submit to examination by the Company," "produce for the Company's examination all pertinent records," and "cooperate with the Company in all matters pertaining to the loss."  And, Section 5 required Plaintiff to provide a "proof of loss, duly sworn to, with full particulars."  Defendant argues that Plaintiff breached these provisions by making countless misrepresentations and omissions regarding, for example, the fact that the computer was left running with the tokens in it on the night of the loss, how the wire transfer process should work and how the transfers at issue were initiated, the various ways in which Plaintiff's employees violated policies, Plaintiff's IT consultant's analysis of the computer and storage of the hard drive, and Plaintiff's correspondence with law enforcement agencies.  (See Def.'s SJ Mem., at 43–46.)  Defendant also claims that Plaintiff breached the Bond's provisions by refusing to disclose the Federal Reserve documents or to comply with KCESD's request for a face-to-face meeting with Plaintiff's employees.  (See id. at 46.)

While Defendant goes to great lengths to describe the many ways in which Plaintiff allegedly breached its duty to cooperate, Defendant's only descriptions of the prejudice it allegedly suffered as a result are that Plaintiff "materially prejudiced BancInsure's ability to evaluate the claim" by "obscuring the true cause of the loss," (id. at 46–47), and that, had Plaintiff disclosed this information in its Proof of Loss, Defendant could have denied coverage in early 2012 rather than conduct its own forensic analysis and spend two years trying to obtain the information necessary to evaluate the claim, (Def.'s SJ Reply, at 13). As discussed above, however, the true cause of the loss was computer systems fraud caused by a hacker, as was initially represented by Plaintiff.  Moreover, the evidence shows that Defendant retained its own forensic computer specialist to conduct an investigation because Plaintiff had not conducted its own investigation and the FBI was not willing to share the results of its investigation.  However, even after Plaintiff provided to Defendant the logs and images collected by Plaintiff's IT consultant following the loss, Defendant went forward with its own forensic analysis conducted by Mr. Lanterman.  Accordingly, Defendant's claim fails because it has not presented evidence from which a reasonable jury could conclude that any alleged lack of cooperation resulted in prejudice—let alone substantial prejudice—to Defendant.

### 3.    Prejudgment interest

In Minnesota,

> [a]n insured who prevails in any claim against an insurer based on the insurer's breach or repudiation of, or failure to fulfill, a duty to provide services or make payments is entitled to recover ten percent per annum interest on monetary amounts due under the insurance policy, calculated from the date the request for payment of those benefits was made to the insurer.

Minn. Stat. § 60A.0811, subd. 2(a); see Schwan's Sales Enters., Inc. v. SIG Pack, Inc., 476

F.3d 594, 595 (8th Cir. 2007) (stating that "[p]rejudgment interest is a substantive matter of

state law").  Accordingly, Plaintiff is entitled to an award of prejudgment interest in the

amount of ten percent per annum on the $480,000 due under the Bond.  The only dispute

between the parties is the date the interest began to accrue—i.e., when "the date the request

for payment of th[e] benefits was made to the insurer."  (See Def.'s SJ Mem., at 47 n.19.)

Plaintiff argues that the request was made on October 28, 2011, when it notified Defendant

of its loss.  (Pl.'s SJ Mem., at 34.)  Defendant argues that the earliest date on which interest

could have begun to accrue was when Plaintiff submitted its Proof of Loss, but that Plaintiff

did not submit the necessary information and so interest never began to accrue.  (Def.'s SJ

Mem., at 47 n.19.)  However, Defendant cites to no authority for these propositions, and the

plain language of the statute does not support them.  Rather, as Plaintiff notes, the only

reason that it would have notified its insurance company of the fraud would be to request

benefits.  (See Pl.'s SJ Reply, at 21.)  Therefore, Plaintiff is entitled to an award of

prejudgment interest beginning on October 28, 2011, for a total of $140,187.36.[8]

## IV.   ORDER

### THEREFORE, IT IS HEREBY ORDERED THAT:

1.   Plaintiff's Motion for Partial Summary Judgment [Doc. No. 15] is
     **GRANTED IN PART AND DENIED IN PART** as detailed herein;

---

[8]   Ten percent per annum on $480,000 is $48,000.  The daily rate is $131.51
($48,000 / 365).  Assuming that judgment is entered on the date of this Order, September
29, 2014, the amount of prejudgment interest owed from October 28, 2011, is
$140,187.36 ($48,000 + 48,000 + (336 days x $131.51)).

2.      Plaintiff shall submit, within ten days of the date of this Order an affidavit and
        documentation of its reasonable attorney's fees and costs associated with
        bringing its Motion for Partial Summary Judgment;

3.      Defendant may submit a responsive affidavit within ten days thereafter;

4.      Plaintiff's Motion for Summary Judgment [Doc. No. 76] is **GRANTED**;

5.      Defendant's Motion for Summary Judgment [Doc. No. 88] is **DENIED**; and

6.      Plaintiff is awarded the principal amount of $480,000 under the Bond, with
        prejudgment interest of $140,187.36, for a total of $620,187.36.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  September 29, 2014              s/Susan Richard Nelson
                                        SUSAN RICHARD NELSON
                                        United States District Judge